IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

OCTOBER 1998 SESSION

FILED

July 21, 1999

Cecil W. Crowson
Appellate Court Clerk

RICHARD C. TAYLOR,              )
                               )
            Appellee,          )        No. 01C01-9709-CC-00384
                               )
                               )        Williamson County
v.                             )
                               )        Honorable William S. Russell, Special Judge
                               )
STATE OF TENNESSEE,            )        (Post-Conviction)
                               )
            Appellant.         )

For the Appellant:

John Knox Walkup
Attorney General of Tennessee
            and
Glenn R. Pruden
Assistant Attorney General
 of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Joseph D. Baugh, Jr.
District Attorney General
Williamson County Courthouse
P.O. Box 937
Franklin, TN 37065-0937

For the Appellee:

Bradley A. MacLean
SunTrust Center, Suite 1900
Nashville, TN 37219

Sabin R. Thompson
401 Church Street, Suite 2600
Nashville, TN 37210

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The state of Tennessee appeals as of right from the Williamson County Circuit Court's grant of post-conviction relief to the petitioner and the setting aside of his first degree murder conviction and death sentence due to the ineffective assistance of counsel. The petitioner presents additional claims in support of post-conviction relief in the event that this court reverses the trial court's rulings.

The petitioner was convicted in 1984 for the first degree murder of correctional officer Ronald Wayne Moore and received the death penalty. The convictions and sentences were affirmed on direct appeal to the Tennessee Supreme Court. State v. Taylor, 771 S.W.2d 387 (Tenn. 1989), cert. denied, 497 U.S. 1031, 1110 S.Ct. 3291 (1989). The petitioner filed his post-conviction petition, and the trial court conducted several evidentiary hearings in 1994 and 1995. The trial court granted the petitioner relief on February 27, 1997, concluding that counsel had been ineffective at both the guilt and sentencing phases of the petitioner's trial.

The state contends that the trial court erred in granting the petitioner full relief, generally claiming as follows:

> (1) the trial court applied the wrong legal standard for determining the existence of prejudice when deciding the claim of ineffective assistance of counsel, and

> (2) the evidence adduced at the post-conviction hearing, when considered with the evidence presented at trial, preponderates against the trial court's finding that trial counsel rendered ineffective assistance at the guilt and sentencing phases of the petitioner's first degree murder trial.

The petitioner asserts the following additional grounds:

2

(1) the petitioner was not competent to stand trial and the original trial court never made a proper determination of the petitioner's competency;

(2) the state's withdrawal of medication from the petitioner on the eve of trial without any stated medical reason and without notice to the defense or to the court violated the petitioner's constitutional rights;

(3) prison guards violated his constitutional rights by torturing and abusing him before, during and after his trial; and

(4) the petitioner is entitled to post-conviction relief on the bases of other claims, viewed separately and cumulatively, which the petitioner asserted at different stages in this case.

First, we must deal with the petitioner's request that the state's appeal be dismissed because of noncompliance with rules of appellate procedure and trial court orders relative to the appeal. The petitioner's claims include the state's failure to serve him with its notice of appeal, failure to file a complete transcript timely, filing of a notice of filing when the transcript was not actually filed with the trial court clerk, and failure to provide missing exhibits and to include them in the record on appeal. As the state notes, the petitioner made most of these claims in previous motions to dismiss that were denied by this court. It also asserts that most of the claims do not lead to dismissal under the appellate rules. As for service of the notice of appeal, it states that service was made upon the petitioner's attorney, and it asserts that the petitioner has shown no prejudice accruing from the claimed deficiencies. We see nothing in this case indicating any act or omission by the state that would warrant our dismissing the appeal. We will proceed to the merits.

The supreme court's direct appeal opinion provides the following synopsis of the evidence presented at the petitioner's trial:

Corrections Officer Moore was stabbed to death on the night of August 28, 1981. It is undisputed that the killer was the defendant, Richard C. Taylor. The issue raised in defense of the murder charge was that defendant was insane at the time of the homicide.

3

The record shows that Mr. Taylor believed that he had been treated unfairly by Officer Moore on several occasions. Defendant blamed Moore for preventing defendant from receiving a stereo and television set left to him by an inmate who had been transferred from the Turney Center. On the day of the killing, Moore reprimanded the defendant for failing to properly clean the hall. The incident that "set off" the defendant, however, occurred an hour or two before the killing when Moore removed a towel that another inmate, Tony Bedwell, had hung over the window in a cell door to dry and pushed the towel under the door. When Bedwell asked Moore what was going on, Moore explained the regulations against covering the window in the cell door. To Bedwell, the incident was "nothing big," but defendant, who had seen what happened, advised Bedwell to "kick [Moore] up the side of his head." Bedwell next saw the defendant when he and Wayne Patterson came to Bedwell's cell to ask if Bedwell had a knife.

Around 9:00-9:30 p.m., the defendant approached Moore as he stood talking to some inmates, cursed and asked Moore, "Now what are you going to do, S.O.B.?" Defendant then grabbed Moore and began to stab him repeatedly with a prison-made knife. Pleading with defendant to stop, Moore retreated down the hall. Defendant continued to hold Moore and continued to stab him. Other inmates protested and tried to come to the aid of Moore, but were warned off by defendant brandishing his knife.

After the stabbing, defendant returned to his cell block, where he concealed the knife in a closet and changed his clothing. Officer Moore died about forty minutes later in the prison infirmary from internal bleeding caused by a wound that had penetrated his inferior vena cava. He also had suffered potentially fatal stab wounds to the pancreas and the spleen.

Several inmates described defendant's appearance and actions. According to inmate Patterson, the defendant was "hyper" and nervous. After the killing the defendant walked around the hallway "in shock," disoriented, bumping into people and the wall. Patterson said defendant was shaking and trembling, with an "expression on his face like a wild horse." The officers who apprehended defendant after the killing, however, while remarking that he was shaking and stuttering and appeared nervous, said that defendant was not confused, was responsive, coherent and understood their questions. Defendant indicated he understood his rights and signed a waiver but refused to sign a confession or allow his confession to be written down.

Taylor, 771 S.W.2d at 389-90.

The jury found that the following aggravating circumstances warranted the death penalty: (1) the defendant previously had been convicted of a felony that

4

involved the use or threat of violence to a person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed by the defendant while he was in lawful custody or in a place of lawful confinement; and (4) the murder was committed against a corrections employee who was engaged in the performance of his duties, and defendant knew that the victim was a corrections employee who was engaged in the performance of his duties. Tenn. Code Ann. § 39-2-203(i)(2),(5), (8) and (9) (1982). In reviewing the case, our supreme court concluded that the evidence sustained the verdict and the sentence. 771 S.W.2d at 389.

## POST-CONVICTION EVIDENTIARY HEARING

Marlindo Bruno, a paralegal, testified that she had worked with the petitioner's post-conviction attorney on this case since 1990 or 1991 and that she was responsible for the custody of the documents obtained by petitioner's counsel. Through her, petitioner's counsel introduced as exhibits copies of the trial transcript; the jury instructions requested and those read at trial; the defense's Brady and Jencks requests at trial; the petitioner's medical records obtained in the previous trial from the district attorney's files and from the Department of Correction; a chart of the petitioner's institutional history; pleadings to unseal adoption records and the adoption records themselves; court records of the petitioner's father and grandfather; a report by Dr. Glenn Watson obtained from the district attorney's files; a tape of the state's interview of Dr. John Filley, the psychiatrist who testified for the state at the original trial regarding the petitioner's competency and sanity; an enhanced tape of the Filley tape; a transcript of the enhanced tape; copies of Dr. Filley's notes; letters written by the petitioner shortly after the murder; Officer Greenlee's statement; an anonymous statement taken from the district attorney's files; a statement and tape recording of interviews with several prison inmates and the petitioner; an enhanced tape of the interview tape; a

5

transcription of the enhanced tape; the victim's personnel records; and Tennessee Department of Motor Vehicle records of the victim.

Eric G. Prestidge, a recording engineer, testified that he had enhanced the tapes introduced at the hearing to make them more intelligible. He explained the process of enhancement and stated that the two tapes were labeled the Filley tape and the confession tape.

Dr. William H. Tragle, III, a psychiatrist employed part-time at the Forensics Division of Middle Tennessee Mental Health Institute, testified that while employed by the Dede Wallace Mental Health Center, he consulted with and treated the petitioner from 1981 to 1985. He testified that he did not consult with any state or defense experts before they testified at trial about the petitioner's competence and sanity. He also stated that petitioner's counsel did not contact him.

After reviewing his notes from the treatment period, Dr. Tragle testified that in November 1981, he had recommended that the petitioner be placed in DeBerry Correctional Institute, a facility that housed prisoners in need of mental health treatment. He stated that at that time, he did not think that an adequate evaluation could be done at the prison and that he prescribed Haldol and Thorazine, two psychotropic medications, for the petitioner. He stated that he prescribed the medications because he believed that the petitioner suffered from an anti-social personality disorder.

Dr. Tragle testified that in February 1982, he again visited the petitioner and considered him to be suicidal. He said that he put him on a suicide watch, ordering that he be observed every thirty minutes. He said in June 1983, he observed that the petitioner appeared to be psychotic but that the symptoms abated when treatment

6

began. He concluded that the petitioner had a propensity for assaultive behavior which could be reduced with medication. He stated that in November 1984, he met with the petitioner, and he noted that the petitioner appeared suspicious, telling him that he did not want anyone to know what was on his mind. Dr. Tragle stated that he felt that the diagnosis of an anti-social personality might not be correct and that the petitioner's illness might be more serious.

Dr. Tragle testified that on November 2, 1984, he discontinued medications at the petitioner's request. He said that on December 7, 1984, Haldol, Thorazine, and Cogentin were again prescribed for the petitioner. He said that on January 7, 1985, he examined the petitioner and concluded that he could not properly assess the petitioner while he was housed at the Tennessee State Penitentiary and could not specifically make a diagnosis. He stated that in his last memo to Warden Dutton, he urgently recommended that the petitioner be transferred to DeBerry Correctional Institute due to his psychotic behavior.

Dr. Tragle testified that he had reviewed two boxes of the petitioner's medical history. He testified that the petitioner had been abandoned by his parents and placed in a foster home. He said the petitioner was subsequently adopted and his half-sister was later adopted by the same family.

Dr. Tragle testified that these records revealed the petitioner's use of morphine, cocaine, phencyclidine, glue, marijuana, quaaludes, amphetamines and alcohol at a very early age. He said the petitioner was placed in institutions around Nashville and in Tullahoma, Tennessee. He said the documents showed that the petitioner had numerous conflicts with his adoptive parents. He said that in one interview, the petitioner admitted that he had committed one hundred and six illegal acts, and in another interview, he admitted to one hundred and forty-six acts. Dr.

Tragle stated that the history revealed that the petitioner exhibited mistrust, narcissism, depression, grandiosity, photophobia, hallucinogenic occurrences, and a lack of empathy. In summary, Dr. Tragle testified that throughout the petitioner's medical history, the petitioner exhibited symptoms of psychosis.

The trial court questioned Dr. Tragle concerning the testimony of Dr. Filley, the psychiatrist who testified at the petitioner's original trial. Dr. Tragle responded that he did not understand why Dr. Filley had not seen the possibility of the previously mentioned disorders. He said he felt that Dr. Filley should have considered the petitioner's consistent drug abuse and his early childhood experiences. He stated that any examining psychiatrist should have considered a borderline personality disorder, paranoia, hypermania, and depression. He testified that, in his opinion, the two sessions Dr. Filley had with the petitioner, lasting a total of three hours, and the one psychological written test administered to the petitioner did not constitute a proper evaluation. He said he felt that Dr. Filley should have evaluated the petitioner on an inpatient basis over time. He characterized the level of the petitioner's disorders as severe to extreme. He stated that the petitioner's statement that he had killed the victim because he thought the victim was his father was a plausible explanation. He also stated that the letters the petitioner wrote shortly after the killing that were introduced by the state at the original trial should have been used by defense counsel to show clear indications of his severe mental condition.

On cross-examination, Dr. Tragle admitted that he had never seen the petitioner in a delusional or hallucinogenic state and that the petitioner was psychotic in an atypical way. He admitted that the letters the petitioner wrote shortly after the killing indicated that the petitioner understood the charges against him, that he realized that he could potentially face the death penalty, and that he exhibited the thought process that he could put on a "crazy act." Dr. Tragle also stated that although he had not been

contacted by defense counsel, Dr. Filley, or Dr. Ragheb, he had been in contact with Dr. Chip Burson and Dr. Mitch Stein, who also testified at the petitioner's original trial.

On redirect examination, Dr. Tragle reiterated that in his opinion, the petitioner should have received an inpatient evaluation at DeBerry Correctional Institute. He said the records revealed that the petitioner was sent to DeBerry but was returned shortly thereafter without an in-patient review. He also refuted Dr. Filley's statement at the original trial that none of the statements in the petitioner's prison record which concluded that the petitioner was psychotic were made by a psychiatrist or psychologist. Dr. Tragle then noted numerous indications in the petitioner's prison record that show certain professionals had, indeed, considered him psychotic. A tape recording of a conversation with Dr. Filley and state counsel was then played for the court. It was noted that the tape was never turned over to defense counsel at trial.

Gordon Bonnyman, Jr., an attorney with Legal Services of Middle Tennessee, Inc., testified that he had been lead counsel in two cases related to whether conditions in the Tennessee prison system violated the Eighth Amendment and due process rights of inmates. He said that this litigation resulted in the court's determination that conditions on death row at the former Tennessee State Penitentiary were unconstitutional. He testified that during the Grubbs litigation, information concerning mental health services at the Tennessee State Penitentiary, particularly the West-100, was provided to the court. See Grubbs v. Bradley, 552 F. Supp. 1053 ( M.D. Tenn. 1982). The West-100 was the first floor wing on the west side of the prison hospital and housed a mixture of acutely disturbed psychiatric patients. The district court's findings of fact in Grubbs concerning the conditions of West-100 were entered as an exhibit. Essentially, the district court concluded that "the little treatment that patients caged in West-100 could formerly have hoped to obtain is no longer available." 552 F. Supp. at 1087. The court noted that the lead staff member had warned the

9

warden that changes in the unit had rendered it "dangerous and unfit for housing mentally disturbed inmates," and that the hospital administrator considered this unit to be bordering on "inhumane." 552 F. Supp. at 1087.

Frank D. Atkinson, sheriff of Hickman County, testified that he interviewed the petitioner on the night of the killing. He said that when a guard brought the petitioner to him for interrogation, the guard told him that the petitioner was "subject to go off at anytime." A tape recording of the interview was played for the court. Sheriff Atkinson also said that the petitioner told him that at the time of the killing, the victim had been "standing, talking, talking to him, and he was telling about the drugs out in his truck." Sheriff Atkinson reviewed the victim's employment records, and the records revealed that the victim was on probation for insufficient performance and poor attendance at the time of the killing.

The petitioner's lead attorney at trial testified that he had been practicing law for two years when he became involved in the petitioner's case and that he had worked on two capital cases prior to that time but not as lead counsel. He stated that this case was his first criminal case as lead counsel, his first capital case as lead counsel, and his first case in which the defense was the defendant's mental state.

The attorney identified an exhibit which was an affidavit he had submitted to appellate counsel in this case. In the affidavit, he stated that he had met with the petitioner for the first time in November of 1981 at the DeBerry Correctional Institute and that the petitioner had appeared very agitated and intense. The affidavit revealed that the petitioner shook, displayed inappropriate behavior and made inappropriate responses. The affidavit revealed that the petitioner mistakenly thought that co-counsel had been the prosecutor in the case that initially brought the petitioner to prison. The affidavit revealed that the petitioner's speech pattern was rapid, halting and staccato,

and that his facial mannerisms could be characterized as contortions. The affidavit described his personal appearance as unkempt and disheveled.

In the affidavit, the attorney stated that he represented the petitioner from 1981 until late 1985 or early 1986 and that during this time, the petitioner's behavior had vacillated dramatically. His ability to communicate with counsel had deteriorated, and it had become apparent that his condition was better or worse depending on medication. As the trial date approached, the petitioner was unable to assist in the preparation of his defense. He was uncooperative as to how he should dress and act at trial. During the trial, he made faces and gestures toward jurors and witnesses. He refused to remove his sunglasses. Other than personal interviews, counsel spoke with the petitioner in excess of one hundred times on the telephone, but the calls were consistently unproductive in that the content of the conversations had ranged from being totally meaningless and absurd to idle chatter. The petitioner believed he was in contact with a universal computer network that would allow him to perform any task he wished. He also told counsel that he had bubonic plague. The petitioner made one legitimate suicide attempt. After he was sentenced to death, he repeatedly attempted to persuade counsel to assist him in suicide by smuggling weapons and poisons to him so that he could take his own life.

The attorney testified that he had first met with the petitioner four months after the killing and that as far as he knew, the petitioner had not seen anybody in that period of time except for his custodians. He stated that the petitioner's ability to cooperate or assist in his defense was "very, very limited." He testified that he had never represented a defendant who was as seriously mentally disturbed as the petitioner. He reiterated much of what was stated in his affidavit and said that on the first day of trial, the petitioner's behavior was so bizarre that he requested that the petitioner be kept out of the courtroom during jury selection. He said that the petitioner

11

rejected this request and was brought into the courtroom. The attorney testified that at that time, he stated on the record that he did not think the petitioner was competent to stand trial. He said the trial court then made arrangements for Dr. Mitch Stein to evaluate the petitioner's competency, but the petitioner refused to talk to Dr. Stein. The attorney testified that because the petitioner had been previously evaluated by the state and declared competent, he felt that he could do nothing.

The attorney then identified a letter that he had written to Mrs. Melissa Patey, administrator at the Middle Tennessee Health Center, who eventually signed a letter to the trial court stating that the petitioner was competent and sane. He said the letter was written in response to a request for information to be used in the petitioner's evaluation. He said the letter contained names and statements from ten people from the State Department of Correction and the inmate population who had contact with the petitioner since the killing. He said each of the ten related in some fashion that the petitioner was not competent.

The attorney testified that he encouraged the Middle Tennessee Health Center personnel to conduct an intense evaluation of the petitioner over a period of time without medication. However, according to counsel, the petitioner was evaluated for a period of only two hours in two visits. The attorney then admitted that he had not demanded a competency hearing before trial because he was afraid that he would reveal his trial cross-examination to the state. He admitted that it never occurred to him to present lay testimony on the issue of competency. He then stated that it was his opinion that his performance in this case failed to reach the level of assistance demanded in Baxter v. Rose, although he said he did not consciously violate any standard. He stated that he did not interview any of the people who had made notations in the petitioner's medical and institutional records from the Department of

12

Correction concerning his psychotic mental state but that he had read the records and had given them to Dr. Stein.

The attorney admitted that he did not contact Dr. Tragle. He admitted that he did not try to get the adoption records of the petitioner although he felt the records were extremely important. He stated that in attempting to portray the petitioner as a human being rather than a monster, the records would have been invaluable because his adoptive parents were totally alienated from him at the time of trial.

The attorney testified that although he had filed Brady and Jencks motions, he had never received the tape of the state's interview with Dr. Filley. He stated that the tape was important because Dr. Filley indicated that an assessment should have been made of the petitioner on and off medication and that the petitioner exhibited a sign of psychosis when the petitioner stated that he thought the victim was his father. The attorney stated that he had never been given copies of letters written by inmates to the district attorney indicating that the petitioner had been set up to commit the murder by other inmates. He admitted that he did not have the petitioner assessed to determine whether the petitioner had organic brain problems.

The trial court then ordered that the petitioner be evaluated by a court-appointed psychiatrist. The post-conviction hearing resumed on September 18, 1995, at which time Nancy Van Sant Palmer, an attorney, testified that she began working on this case in October of 1992. She stated that she spent more than two hundred hours with the petitioner. She testified that the petitioner had lived in solitary confinement on death row since 1981. The petitioner's institutional and adoption records; affidavits from biological relatives, adoptive relatives, employers, and a social worker; and the petitioner's childhood medical records and school records were introduced into evidence. The petitioner's older sister's psychiatric records were introduced into

13

evidence, revealing that the sister had a long mental health history, including a diagnosis of schizophrenia. An interview with Troy Roscendo Collins, the half brother of the petitioner, revealed that he had experienced a serious drug and alcohol problem. A chart of the petitioner's family tree showed significant drug and alcohol abuse problems and psychiatric problems throughout the family.

Ms. Palmer testified that the childhood medical records of the petitioner revealed that he had been taken to the doctor twenty-seven times before he was age three. She stated that the records also showed that the petitioner was frequently inaccurate in what he said about his life compared to what the records revealed. Notes from Dr. Ragheb, an expert for the state who testified at the original trial, were introduced into evidence, and Ms. Palmer testified that many of the notes were not accurate. For instance, the notes indicated that the petitioner had a history of abusing animals, but no evidence supported this determination. Ms Palmer testified that the records explained the circumstances surrounding the events of the crimes for which the petitioner was in prison at the time of the killing. Ms. Palmer introduced into evidence a record on mitigation that could have been presented at the time of trial.

Ms. Palmer then testified as to what the petitioner had told her during the two hundred hours she spent with him. She said the petitioner felt that she was not his savior but that the trial court was and that the state was his family. She stated that it took a long time to talk to the petitioner because his speech was incoherent. She testified that the petitioner could not give a coherent explanation of events surrounding the killing. She said that when questioned concerning his family, the closer the question was to his emotional attachment to his family or his experiences with his family, the less reliable and coherent the information was. It was Ms. Palmer's opinion that the petitioner could not consult with counsel and assist in preparing his defense and that he was not competent to stand trial at the time of the post-conviction hearing.

14

Dr. Pamela Mary Auble, a psychologist with a specialization in neuropsychology, testified that she had been asked to assess the competency of the petitioner and had reviewed many of the records pertaining to the petitioner's history. She described many of the tests that she had administered, and she introduced into evidence the report she had submitted to the court. She said that in the report, she concluded that the results evidenced extensive psychopathology. She stated that in addition to antisocial traits, the petitioner exhibited evidence of paranoia and psychosis.

In reviewing previous test results of the petitioner, Dr. Auble stated that these results were consistent with her findings. Although Dr. Auble testified that the petitioner's results on the Minnesota Multiphasic Personality Inventory (MMPI) she had administered were not valid because he had over-endorsed pathology, she reviewed the results from a previously administered MMPI and concluded that the results indicated that the petitioner had significantly high scores on the schizophrenia scale and the hypomania scale. Dr. Auble's diagnosis was that the petitioner suffered from a borderline personality disorder. She described the petitioner as immature, unable to trust people, unable to relate to others, mentally rigid, and unable to adapt to new situations. She stated that he reacts impulsively, especially when he is under stress. When questioned concerning the petitioner's malingering, Dr. Auble stated that it was her opinion that he engages in the type of malingering associated with a borderline personality disorder.

Referring to a report submitted by the court-appointed psychiatrist, Dr. Rappeport, Dr. Auble stated that Dr. Rappeport had not examined important factors concerning the circumstances surrounding the killing. She said that instead, he had questioned the petitioner about what his perceptions were at the time of the killing. Dr. Auble testified that upon reviewing other inmates' statements, it appeared the petitioner

15

was in a state of shock after the killing and was not malingering when he told officers that he thought the victim was his father. She also stated that the letters the petitioner wrote following the killing were not reliable because the petitioner had not been reliable concerning any other part of his history. On cross-examination, Dr. Auble testified that she agreed with Dr. Rappeport's report in part but disagreed that at the time of the killing, the petitioner had exhibited no sign of psychosis.

Dr. John Kirby Pate, a psychiatrist, testified that he had reviewed all relevant medical and prison records of the petitioner, the social history developed during the case, Dr. Auble's report, and Dr. Rappeport's report. He testified that he agreed with Dr. Rappeport's diagnosis that the petitioner suffered from an antisocial personality disorder and borderline personality disorder but that he disagreed that the petitioner was not psychotic and was competent. According to Dr. Pate, persons suffering from a borderline personality disorder cannot cope with stress and often become psychotic. He said they become confused, irrational, and impulsive. He stated that when such a person experiences a psychotic episode, the person becomes unable to conform his conduct to the requirements of the law.

Dr. Pate testified that he had interviewed the petitioner on three occasions over a total of six hours and had diagnosed the petitioner as suffering from a borderline personality disorder. He disagreed with Dr. Rappeport that the petitioner was malingering after the killing. After reading the statements of other inmates who had witnessed the killing, Dr. Pate testified that the petitioner was suffering from a psychotic episode at the time of the killing and that it was entirely possible that the petitioner thought the victim was his father. Dr. Pate also stated that the fact that the petitioner had been placed on psychotic medication before trial but at the time of trial was taken off the medication would have caused him to be more anxious, impulsive, and cognitively disorganized at the time of trial. Dr. Pate also believed that at the time of the

16

hearing, the petitioner was not competent to stand trial. On cross-examination, Dr. Pate admitted that he was opposed to the death penalty.

The petitioner's attorney on direct appeal testified that on his first meeting with the petitioner, the petitioner struck him as being "one of the most out of touch people [he had] ever been around." He testified that the petitioner had not been able to focus on anything having to do with his case. He described incidents during his representation when the petitioner referred to himself as Carlos, a Central American terrorist, and often used a South American accent when being interviewed. He testified that at no time during his representation of the petitioner did the petitioner assist him in his defense. He stated that the petitioner, however, always took the position that he was competent and filed motions with such titles as "Best of Ability Motion." When questioned concerning whether the petitioner had exhibited signs of malingering, counsel testified that he never perceived that the petitioner was trying consciously to mislead anyone concerning his mental condition.

Appellate counsel testified that he had filed a post-conviction relief petition challenging prior convictions on behalf of the petitioner but that when he had attempted to discuss the petition with the petitioner, the petitioner became agitated and would not cooperate. On cross-examination, counsel admitted that he was personally opposed to the death penalty. On redirect, counsel acknowledged that the petitioner's prior offense of robbery involved stealing a pack of cigarettes.

Lead trial counsel for the petitioner was recalled to testify. He recalled that on the first day of jury selection at the petitioner's original trial, the petitioner was so agitated that counsel attempted to talk him into waiving his presence in the courtroom, and when the petitioner would not waive the right, counsel participated in an in-chambers conference with the judge concerning his competency. He said that Dr. Stein

17

was called to conduct a competency hearing on the spot, but the petitioner refused to cooperate with him. Counsel admitted that he had not recalled Dr. Stein to attempt another evaluation. The original trial court had then ruled that the petitioner was competent to stand trial. Counsel testified that although he was convinced that the petitioner was not in any shape to go to trial, the defense had no way to show that the petitioner was not competent because the state's expert had found him competent, and the petitioner would not respond to defense experts.

Counsel admitted that he did not present any evidence regarding the petitioner's prior convictions for robbery and joyriding at the sentencing hearing. He stated that if he had known that the petitioner had been taken off his medicine shortly before trial, he would have brought that to the attention of the court. He also stated that because he had been denied funds for a defense expert until eleven or twelve days before trial, he had not been ready for trial at the time it commenced but had not requested a continuance.

Co-counsel for the petitioner at the original trial testified that he had been appointed to the case approximately two months before the trial. He stated that he could not recall conducting any field investigation in the case. Co-counsel corroborated lead counsel's testimony concerning their concern about the petitioner's competency on the first day of trial. He recalled that funds for expert services had been denied by the trial court until shortly before trial and that at that time, the defense was committed to witnesses that had already volunteered their services. He confirmed lead counsel's testimony that any conversations between counsel and the petitioner at trial had been meaningless. He testified that the petitioner had misbehaved during the trial repeatedly, especially with regard to his appearance. He stated that upon reflection of the petitioner's behavior throughout co-counsel's representation, it was his opinion that the petitioner never fully appreciated what was happening to him in the legal system

18

and that he fought counsel throughout the trial. He testified that he never thought the petitioner was faking his symptoms.

The petitioner testified that the victim had not been stabbed in the back, that he had not said that he hoped "the son of a b----" died, that other prisoners had hidden the knife, that prisoner Patterson had control of the knife that killed the victim, that he had been offered five hundred dollars to kill the victim but that he had initially refused because he was an orphan of the state and it was his duty to protect an agent of the institution, and that he had not intended to kill the victim but that the victim had made another inmate think the petitioner had called him "nigger" when it was actually the victim who called the inmate "nigger." He also stated that he had tried to leave before stabbing the victim, but a force had prevented him from leaving.

Appellate co-counsel for the petitioner testified that in his first meeting with the petitioner, the petitioner would not talk with him and staged a "one-man play in which he reached under a chair and said, 'what if I had hidden a gun here and then proceeded to go through a prison escape. . . .'" Counsel stated that at no time during his representation of the petitioner did the petitioner appear to be interested in his case. He said the petitioner would assume foreign identities and talk nonsense. He said he believed that the petitioner was interested in dying. He recalled the petitioner becoming fixated on lead counsel's fiancee at a hearing and telling the trial court that she was a Contra. On cross-examination, counsel stated that it was his opinion that the petitioner was not responsible for his actions and that the petitioner was not malingering, either at the original trial or at the post-conviction evidentiary hearing.

David Raybin, a practicing attorney, testified as an expert for the defense that he had worked for the Attorney General when Tennessee's death penalty statute had been declared unconstitutional and that he had drafted the current death penalty

19

statute. He stated that he had reviewed materials in this case but had never spoken with the petitioner or with any of the attorneys associated with the original trial. He testified that in the present case, there was no Sixth Amendment violation regarding premeditation or deliberation or the guilt or innocence phase involving insanity, but there was a Sixth Amendment violation in regard to mitigation during the sentencing phase and to the issue of competency. In concluding that counsel was ineffective with regard to mitigation, he noted that lead counsel had not interviewed Dr. Tragle and had not obtained adoption records. He also noted that the Filley tape would have been important to the defense. He concluded that because the jury had not been adequately informed, a reasonable probability existed that it would have reached a different result if the information had been provided.

Dr. Jonas R. Rappeport, a psychiatrist, testified that the post-conviction court asked him to evaluate the petitioner and to render an opinion as to the petitioner's sanity at the time of the offense, a diagnosis of his mental illness at the time of the offense, and a determination of his competence at the time of the post-conviction hearing. Dr. Rappeport stated that he reviewed all materials sent to him and that he secured the services of Dr. Diana McCoy to conduct a social background investigation of the petitioner. Dr. Rappeport testified that he also consulted with others who had reviewed the petitioner's records, with a psychiatrist who specialized in genetics, with a neurologist concerning the petitioner's tremors, with Dr. Auble, and with Dr. Pate. He then opined that the petitioner suffered from an antisocial personality disorder and a borderline personality disorder. He testified, however, that he had not seen evidence of psychosis in the petitioner. He concluded that the petitioner's belief that he was an orphan of the state did not qualify as a delusion. He stated that he found evidence of malingering by the petitioner when he told officers that he thought the victim was his father and that a special force had caused him to commit the offense. He also stated that it was his opinion that the petitioner was competent in 1984 to stand trial.

On cross-examination, Dr. Rappeport admitted that the bill for his services was over twenty thousand dollars, that Dr. McCoy billed over twenty-six thousand dollars and that Dr. Shapiro billed six hundred dollars. Dr. Rappeport stated that he had met with the petitioner for approximately five hours and then with Ms. Palmer and post-conviction counsel. He said he told post-conviction counsel that this was a difficult case. He said he then met with Dr. Auble and then with the petitioner again for approximately three and one-half hours. He said he told post-conviction counsel that he needed a social history of the petitioner and an examination by a neurologist. He said that when he returned to Baltimore, he wrote to Dr. McCoy and informed her that he had major concerns about the petitioner's prenatal care and early childhood. He said he then wrote the trial court and requested permission for the services of Dr. McCoy and Dr. Shapiro.

Dr. Rappeport admitted that persons suffering from a borderline personality disorder may experience transient psychotic episodes and can lose control of their anger and rage. He also admitted that he had written Dr. McCoy to inform her that he did not want her to look into the conditions of the prison at the time of the killing or at the time of trial or to interview anyone who had examined the petitioner. Dr. Rappeport admitted that although he had informed Dr. McCoy that he had spoken with all of the individuals who evaluated the petitioner at the time of the original trial or immediately after the murder, he had not actually interviewed anyone. He further admitted that no person had evaluated the petitioner immediately after the murder. Dr. Rappeport admitted that his report did not mention any witness's observations of the petitioner around the time of the killing or any of the stresses that might have existed in the petitioner's life at this time. He said his report did not mention that the petitioner had been taken off his medication prior to the killing or that the prison to which the petitioner had been transferred was considered a "death trap" by a prison expert who had visited it within three weeks of the killing.

21

Dr. Rappeport acknowledged that in 1980, the petitioner was twice diagnosed with paranoid schizophrenia at Multi-County Comprehensive Mental Health Center and that Dr. Tragle, in 1984, had diagnosed the petitioner as having an explosive personality disorder. He admitted that in his report he had not included the fact that the petitioner had been taken off his medication shortly before his trial. He admitted that he had not reviewed all the materials that were sent to him but stated that his associates had reviewed them and that he had reviewed their notes. He admitted that he had not contacted co-counsel in the original trial even though post-conviction counsel had encouraged him to do so. He admitted that there had been several instances in the petitioner's background in which psychiatrists and psychologists noticed psychotic symptoms and did not suspect malingering. Post-conviction counsel then referred to numerous errors or misstatements in Dr. Rappeport's report concerning the petitioner's family history of mental illness, the statement that the petitioner had been transferred from Turney Center to DeBerry Correctional Institute for drug treatment in 1981 when he had actually been transferred for psychiatric treatment, and inaccuracies concerning names, dates, and the like.

Dr. Patricia Corey, a psychiatrist at Middle Tennessee Mental Health Institute (MTMHI) testified as a rebuttal witness. She said that she had been the admitting doctor for the petitioner in 1979 and had diagnosed him as suffering from psychosis associated with drug intoxication. She stated that she had seen no signs of malingering at that time. She said that after the petitioner was admitted to MTMHI, Dr. Ragheb had treated him, and his diagnosis had been an antisocial personality disorder with drug abuse and drug-induced psychosis. Dr. Corey stated that she testified at the petitioner's original trial and that she witnessed the petitioner acting in a very bizarre manner at the trial. She stated that based upon her observation of the petitioner, as well as her communications with counsel at the original trial, it was her opinion that at the time of trial, the petitioner was not capable of assisting counsel in his defense.

22

In its "Findings of Fact and Conclusions of Law," the trial court concluded that although numerous issues had been previously determined or waived, the petitioner's trial counsels' performance was not within the range of competence demanded of attorneys in criminal cases and that counsel had not adequately prepared the case for trial at both the guilt phase and the sentencing phase. The court further found that the petitioner was prejudiced by the inadequacy of trial counsels' performance. The trial court set aside both the conviction and sentence of death and remanded the case for a new trial. However, the court also found that the petitioner was not competent to stand trial and ordered that he be held without bond pending mental competence to stand trial.

In reviewing the trial court's determinations, we are guided by certain well-established principles. The burden was on the petitioner at the hearing to prove his case by a preponderance of the evidence. On appeal, the trial court's findings are conclusive unless the record preponderates against its determinations. Turner v. State, 698 S.W.2d 90, 91 (Tenn. Crim. App. 1985). Further, the burden now rests on the appealing party to illustrate why the record preponderates against the judgment. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

Initially, we are confronted with the state's contention that our review is de novo relative to the ineffective assistance of counsel because resolution of the issue involves a mixed question of law and fact. The state argues that mixed questions do not limit a reviewing court in making its own conclusions from the evidence of record.

We acknowledge that Tennessee courts have previously noted that in certain circumstances, a trial court's findings are not binding on appeal when a mixed question of fact and law is involved. See, e.g., Sullivan v. Green, 206 Tenn. 421, 457,

331 S.W.2d 686, 692-93 (1959) (holding that the material evidence rule in workmen's compensation cases does not apply to a mixed question of fact and law); Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997) (relying upon federal cases to conclude that the question of harmlessness of a constitutional error is reviewed de novo as a mixed question); Coates v. Thompson, 713 S.W.2d 83, 84 (Tenn. Court App. 1986) (stating that a chancellor's findings on mixed questions are not entitled to a presumption of correctness). However, the trial court's determinations in a post-conviction case have not been similarly reviewed relative to the question of the ineffective assistance of counsel.

In Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997), our supreme court stated the following relative to review of a trial court's post-conviction determinations based upon an evidentiary hearing:

> The findings of fact of the trial judge on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings. [Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996)]; Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). In evaluating whether the evidence preponderates against the trial court's findings, we are guided by longstanding rules of appellate procedure. Appellate courts in this State do not reweigh or reevaluate the evidence. We can not substitute our inferences for those drawn by the trial judge. Moreover, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Finally, the party seeking to overturn the findings of the trial judge bears the burden on appeal of demonstrating why the evidence contained in the record preponderates against the findings of the trial judge. Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966); Cooper, 847 S.W.2d at 527; Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). It is with these principles in mind that we evaluate the findings of the trial court and the Court of Criminal Appeal with respect to the petitioner's claim of ineffective assistance of counsel at sentencing.

The court stated that the issue before it was "whether the evidence in the record preponderates against the trial court's finding that the petitioner failed to establish that he was denied his constitutional right to effective assistance of counsel." 960 S.W. 2d

24

at 580. As the court indicates, giving the trial court's decision the weight of a jury verdict in a post-conviction case is not novel. See Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978); Bratten v. State, 477 S.W.2d 754, 756 (Tenn. Crim. App. 1971). In fact, a jury verdict is inherently the jury's answer to a mixed question of fact and law.

The trial court's decision also necessarily involves inferences reasonably drawn from the facts and law, if correctly instructed, that are binding upon us even if we see other inferences that could reasonably be drawn. See Bolin, 219 Tenn. at 11, 405 S.W.2d at 771. In any event, Henley controls. We conclude that our standard of review in this case is whether the evidence contained in the record preponderates against the findings of the trial court, giving due deference to those findings under the well-settled rules noted in Henley.

## I. STANDARD FOR DETERMINING PREJUDICE REGARDING THE INEFFECTIVE ASSISTANCE OF COUNSEL

The state contends that the trial court applied the wrong standard in concluding that the petitioner's trial counsels' deficiencies were prejudicial so as to render their representation constitutionally ineffective. Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Lockhart v. Fretwell, 506 U.S. 364, 369-72, 113 S. Ct. 838, 842-44 (1993). That is, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The Strickland standard has been applied, as well, to the right to counsel

25

under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n. 2 (Tenn.), cert. denied, 493 U.S. 874 (1989).

The state notes that the trial court, in its written findings, stated that but for counsels' deficiencies, "the fact finder could have made a contrary finding." (emphasis added). It asserts that this is a different and lower standard than required under Strickland. The petitioner responds that the trial court's findings are not encapsulated in the part upon which the state relies. He notes that the trial judge was a respected jurist who had been called upon many times to apply the Strickland standard to claims of ineffective assistance of counsel, and he asserts that we should recognize that the standard was applied in this case.

The relevant portion of the trial court's Findings of Fact and Conclusions of Law is as follows:

> In determining whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, a petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the petitioner resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687, reh'g denied, 467 U.S. 1267 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

> The court finds that trial counselors' performance was not within the range of competence demanded of attorneys in criminal cases. Based on the factual evidence adduced during the post-conviction hearing and other submitted information, the court finds that counsel failed to adequately prepare Taylor's case for trial at both the guilt phase [and sentencing]. Counselors did not fully seek exploration of the mental

competency at trial despite the evidence which showed a background replete with mental problems. Counselors failed to explore this issue for mitigation or to put forth evidence concerning his background, medications, and social history. The attorneys admit that they failed to put forth evidence, to call witnesses and to fully flesh out the competence issue. In fact the record has been filled with evidence that was left out of the trial, and especially the sentencing hearing regarding petitioner's mental illnesses.

"It is well established that the issue of mental condition takes on an especially significant role for the penalty phase of capital cases, and there is a heightened need in such cases for trial counsel to investigate and to present evidence of the defendant's mental health and history, particularly in the form of expert testimony, even if that evidence does not render the defendant insane or incompetent to stand trial." See e.g., Cooper v. State, 847 S.W.2d 521, 529-32 (Tenn. Crim. App. 1992).

The court further finds trial counselors did not comport with the requirements of Baxter and that as a result, petitioner was prejudiced by the inadequacy of performance. Furthermore, that but for these errors, the fact-finder could have made a contrary finding.

These determinations came after detailed factual findings relating to the petitioner's mental history that was neither sought nor discovered by trial counsel, the seriousness of the petitioner's mental condition, and the failure of trial counsel to present appropriate evidence of the petitioner's mental condition at appropriate times in the trial.

We believe that the record reflects that the trial court scrutinized the evidence and carefully contemplated its ultimate decisions. We are well aware of the trial judge's long and respected career as a trial and appellate judge with much experience in post-conviction cases that were analyzed and decided under the appropriate standard for the ineffective assistance of counsel. Given the record before us and the full statement of the analysis in the "Findings of Fact and Conclusions of Law," we seriously doubt that the extent of the trial court's findings and conclusions regarding prejudice is confined only to the one sentence questioned by the state. In any event, the trial court made findings from which one can only conclude that the evidence regarding the petitioner's severe mental health problems that was neither

27

sought, found, nor presented by his trial counsel would probably have altered the convicting court's determination that the petitioner was competent to stand trial, the jury's conclusion that he was guilty of first degree murder beyond reasonable doubt, and the jury's conclusion that the death penalty was appropriate. Thus, we view the standard of prejudice to be met by the trial court's findings and conclusions.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The state contends that the petitioner received constitutionally adequate counsel at his trial. It states that counsel did raise and present evidence on the issues of the petitioner's competency and mental condition at the trial. It questions the credibility of the petitioner's trial attorneys and touts the strength of its expert witnesses' testimony regarding the petitioner's mental condition. It also asserts that the evidence presented at the convicting trial was such that the evidence developed at the post-conviction hearing would not have made any difference relative to the competency determination, guilt finding, and sentencing that occurred in the convicting trial.

First, we believe that the state's position regarding the trial attorneys' testimony and the expert testimony would have us reassess witness credibility and reweigh the evidence. As we previously noted, our supreme court has stated that we may neither reassess witness credibility nor reweigh their testimony or the evidence generally. Henley, 960 S.W.2d at 578-89. Moreover, we cannot substitute our inferences for those drawn by the trial court. Id. at 79. The trial court's findings implicitly accredit the attorneys' testimony and doubt the validity of the state's expert testimony.

The state notes that the petitioner's trial counsel raised the issue of his competency before trial and on the day that the trial began and that they presented considerable lay and expert evidence regarding the petitioner's history of mental

28

problems. It asserts that both were done adequately for purposes of the constitutional

right to counsel. The state refers us to the supreme court's opinion in the direct appeal

relative to both assertions.

On the issue of competency, the supreme court's opinion provides:

Defendant first requested a mental evaluation hearing in March 1982; and on April 12, 1982, the trial court ordered his transfer to Middle Tennessee Mental Health Institute (MTMHI). Because the indictment against the defendant was dismissed, the defendant's evaluation was suspended apparently pursuant to regulations that charges must be pending for such evaluations. See T.C.A. § 33-7-301.

Finally, in November 1983, after defendant had been reindicted, the trial court again ordered defendant's transfer to MTMHI for a mental competency evaluation. Dr. Filley interviewed defendant at MTMHI on December 7, 1983, and again on January 25, 1984, for approximately an hour and a half each time. He investigated defendant's responses "about his present circumstances, about the time of his charges in the present case," and observed the mental status of defendant whom he found to be nervous but capable of responding coherently and rationally. Dr. Filley discussed "trial circumstances" with the defendant but left the investigation regarding competence primarily up to Dr. Glen Watson, a clinical psychologist, who conducted one test with the defendant before the defendant refused to allow any further tests. Dr. Filley reviewed Dr. Watson's conclusion that the defendant was competent to stand trial and talked with the defendant "about his understanding of his situation at some length." He concluded that the defendant's need for immediate gratification might cause some difficulty in his conferring with his attorneys, but gave an unqualified opinion in his report to the court that defendant was competent to stand trial, that he understood the charges against him and their consequences and that he was able to advise his counsel and participate in his defense.

At a hearing on February 22, 1984, the defendant challenged the adequacy of the evaluation and requested additional evaluation as to sanity at the time of the offense. Counsel, however, did not specifically argue that defendant was not competent, his major concern at that time being the appointment of a psychiatric expert to assist in the defense.

The competency issue was raised again on the first day of the trial. Counsel for defendant stated that he had serious doubts about defendant's competency based on his "total experience with [defendant] and what's happened the last couple of days and what's going on this morning." Counsel never gave any specific reason for his doubts but the problem

appears to be defendant's general uncooperativeness and his disagreement with counsel "about pretty much everything." The trial court gave Dr. Stein, defendant's psychologist, time to examine the defendant. When the court inquired about the progress of the evaluation, counsel stated that defendant refused to talk with Dr. Stein and offered nothing further. The judge then addressed the defendant who asserted that he was mentally sound, but refused to answer when asked if he understood the charge against him. The defendant, however, was able to discuss his wearing shackles and wanting to dress in "civilian" clothes. Based on his observations of defendant and the previous evaluation of defendant's competency, the trial court did not order a reevaluation of competency, but permitted the trial to continue.

771 S.W.2d at 395-96.

Relative to the petitioner's mental condition, the supreme court's opinion provides:

Taylor, who was twenty-one, had a history of juvenile problems and mental and emotional difficulties that had led to several mental evaluations before the killing of Officer Moore. He had been in the drug and alcohol abuse program at the DeBerry Correctional Institute, a state facility for prisoners with psychiatric problems, before coming to the Turney Center. As a result of his having swallowed broken glass, defendant was incarcerated in West-100, the section of the main penitentiary in Nashville for prisoners with mental problems, from late May 1981, until July 2, 1981, when he was returned to the Turney Center. Defendant had been on several anti-psychotic drugs over this period but there was no record of his receiving any medication on the date of the killing.

Defendant's fellow inmates described him as a loner, moody, and strange. He was characterized as "hyper all the time." One inmate stated, "Richard is a nice guy when he's . . . got his medicine. When he ain't got his medicine, you don't want to mess with him." He had been involved in several incidents of violence toward fellow inmates and the prison staff.

Two attorneys described the defendant's excited and disoriented manner when they had met him three or more months after the killing. He told them a "breathing voice" (he described as his father's) had told him to stab Moore. He claimed to have a difficult time remembering what occurred on August 19. Chip Burson, coordinator of psychological services at the maximum security ward at the main prison while defendant was there in June 1981, testified that defendant had been reclusive, agitated, disoriented, and shaky. He was seen talking to himself in his cell, and Burson had felt he should have been transferred to DeBerry.

After reviewing the defendant's history and institutional record, defense expert Dr. Michael Stein, a psychologist who had conducted a six-hour clinical interview of and administered two tests to the defendant on March 30, 1984, diagnosed defendant as suffering from borderline personality disorder, paranoid personality disorder and brief reactive psychosis. He opined that at the time of the killing defendant was suffering from a psychotic episode as the result of a mental disease or defect and could not therefore appreciate the wrongfulness of his acts or conform his conduct to legal norms. Dr. Stein explained that the letters were the defendant's attempt to establish an identity as a "macho convict criminal type" to compensate for the weak sense of identity common to borderline personalities. On cross examination, however, Dr. Stein admitted that defendant also met most of the diagnostic criteria for an anti-social personality.

A second defense expert, Jonathan Lipman, a doctor of pharmacology with a specialty in neuropharmacology (the study of the effect of drugs on the brain), testified about the effect of anti-psychotic or neuroleptic drugs like those taken by the defendant on the brain and about these drugs' side effects, such as shaking and grimacing, indicative of tardive dyskinesia. Dr. Lipman also testified about supersensitivity psychosis, a psychosis caused by the withdrawal of anti-psychotic drugs from someone who had been taking them for some time, and noted that defendant's history indicated he could have been suffering from such a psychosis at the time of the killing.

The state presented the testimony of two experts, Dr. John Filley, a psychiatrist at the Middle Tennessee Mental Health Institute, [MTMHI] who had examined defendant on two occasions, and Dr. Mohammad Rahib, a psychiatrist who had examined defendant in late 1979 and early 1980. Both men diagnosed defendant as having an antisocial personality disorder, and Dr. Rahib stated there was little substantiation for the theory of supersensitivity psychosis. Neither believed the defendant was suffering from a mental disease or defect that met the standards of Graham v. State, 547 S.W.2d 531 (Tenn. 1977).

In surrebuttal, defendant presented Dr. Jan Mayer, a psychiatrist, who testified that the concept of supersensitivity psychosis was accepted by some members of the medical-scientific community and not by others. Dr. Patricia Corey, a psychiatrist who had examined defendant at MTMHI in late 1979, recounted defendant's bizarre behavior at that time and her initial diagnosis of psychosis associated with drug (amphetamines) intoxication.

. . . .

The state presented no further proof at the sentencing hearing. The defendant presented three witnesses--Dorothy Greer, Assistant Commissioner for Adult Services in the

31

> Department of Corrections, who was questioned about her remark at a legislative hearing that in the defendant's case "I think we did fail;" Jeff Blum, a staff member of the Southern Prison Ministry, who testified about the circumstances of confinement that put the defendant under pressure on August 29, 1981; and Josie Pruett, the defendant's aunt, who testified about the defendant's childhood. From Mrs. Pruett's testimony, the jury was informed that the defendant was an adopted child, who had shown signs of hyperactivity from infancy. His parents had been inconsistent in disciplining him and had not supported him when he became involved in more and more difficulties as he grew up. Defendant had no contact with his parents after he went to prison.

711 S.W.2d at 390-92.

In assessing the actions of the petitioner's trial attorneys regarding competency, the state asserts that it was the attorneys' duty to raise the issue but that it was the trial court's obligation to determine whether the petitioner was competent, the implication being that the attorneys were not responsible for the competency determination. We view the attorneys' obligations to encompass more than merely raising the issue of competency before the trial court. Counsel is "required to exert every reasonable effort on behalf of a client both in the investigation and the trial of a case." State v. Melson, 772 S.W.2d at 421.

In this respect, the matters of concern which were addressed in the post-conviction hearing dealt with the fact that there was an abundance of evidence available to the petitioner's attorney, but not discovered or used. As we have previously quoted, the trial court determined the following:

> Based on the factual evidence adduced at the post-conviction hearing and other submitted information, the court finds that counsel failed to adequately prepare Taylor's case for trial at both the guilt phase [and sentencing]. Counselors did not fully seek exploration of the mental competency at trial despite the evidence which showed a background replete with mental problems. Counselors failed to explore this issue for mitigation or to put forth evidence concerning his background, medications, and social history. The attorneys admit that they failed to put forth evidence, to call witnesses and to fully flesh out the competence issue. In fact the record has been filled

32

with evidence that was left out of the trial, and especially the sentencing hearing regarding petitioner's mental illnesses.

The record supports these determinations.

For example, the pretrial evaluations performed by Doctors Filley and Watson were shown to consist of only one psychological test and two interview sessions totaling only two hours, substantially less involvement than standard procedures required at Middle Tennessee Mental Health Institute. Also, the fact that the petitioner was on antipsychotic medication at the times of the evaluations justified an extended evaluation that was never undertaken. These circumstances would greatly reduce the validity of the institute's "opinion" that the petitioner was competent to stand trial and was sane.

Also, prison records reflected that Dr. William Tragle, a psychiatrist under contract with the state, saw and treated the petitioner from September 1981 through January 1985. He was never interviewed by the petitioner's attorneys although he had been prescribing antipsychotic medication to the petitioner, had recommended that the petitioner receive an extensive mental evaluation, and had taken notes about his observations. Dr. Tragle testified at the post-conviction hearing that Dr. Filley's evaluation was inadequate and that at least a thirty-day inpatient evaluation was required. He said that the petitioner's record, along with his observations, indicated that the petitioner suffered from multiple "severe to extreme" personality disorders that could lead to psychosis, delusional thinking, and loss of control.

Dr. Tragle was in a position to verify that the petitioner's behavior while on medication was substantially different than when he was not on medication. This is significant in the context of both the petitioner's competency at the time of trial and his defense theory. The defense contended that the killing occurred when the petitioner was delusional following the withdrawal of his medication weeks before. Relative to

33

competence, the petitioner's medication had been withdrawn shortly before the trial. Considering the fact that the petitioner's competency in a nonmedicated state was never evaluated, Dr. Tragle's involvement by the defense probably would have led to a different result regarding the issue of the petitioner's competency.

However, it could only have made a difference if the petitioner's attorneys had requested a competency hearing, presented the expert evidence, and placed on the record the details of their continued difficulty in talking with the petitioner and getting his assistance for the trial. This the attorneys failed to do. In sum, if the attorneys had taken the opportunity to interview Dr. Tragle, the only psychiatrist who was regularly observing and treating the petitioner between the time of the offense and the time of the trial, a substantially different picture of the petitioner's competence would have been available to present to the judge at the trial. However, the attorneys utterly failed to present anything that would aid the judge in obtaining a true picture of the petitioner's competence. Contrary to the state's assertion, the fact that the petitioner's competence was considered by the convicting court at his attorneys' request means nothing if the attorneys did not ensure that the available evidence bearing on the issue was presented. In this respect, substantial evidence exists in the record before us that would support a conclusion that the petitioner was incompetent at the time of his trial.

The same is true regarding the issue of the petitioner's guilt and his sentencing. In addition to the evidence not used relative to the issue of competency, the record reflects that the petitioner's attorneys failed to investigate adequately the petitioner's background and medical history, which reflected a family history of mental problems, a difficult upbringing, and a long history of diagnosed mental problems. Along with what was ultimately developed and presented at the post-conviction hearing, evidence that could have been available at the trial, a substantially different mental defense would have been available. Also, a complete picture of the petitioner's family

history, background, and mental history, which was neither discovered nor presented by the attorneys, would have lent personal substance to mitigating the punishment to be imposed. We conclude that the evidence of record does not preponderate against the trial court's findings and determinations and that the record supports the conclusion that the petitioner received the ineffective assistance of counsel.

### III. PETITIONER'S ISSUES

The petitioner raises issues he desires resolved if we reverse the trial court. Although we affirm the trial court, we have reviewed his claims to avoid pending, unresolved issues.

A.      Relative to the petitioner's claim that his conviction and sentence should be set aside because he was not competent to stand trial, we agree with the state that this issue was addressed on the direct appeal of the petitioner's conviction. Thus, as an independent ground of relief, the petitioner's claim has been previously determined and cannot constitute a cognizable ground for post-conviction relief. See Tenn. Code Ann. § 40-30-111, -112(a)(1990 repealed).

B.      As for the claim that the state's withdrawal of his medication before and during his trial constituted a violation of the petitioner's due process rights, we question whether the petitioner properly raised the issue in the trial court as an additional, independent ground for relief. As the state contends, the petitioner did not present this claim in his petition nor did he seek to amend his petition to include it. As an "issue," the petitioner first raised it in his post-trial brief. However, the trial court's findings and conclusions do not address the claim.

The record reflects that the significance of and the circumstances surrounding the withdrawal of the medication were primarily considered in the context of

evidence relevant to the issue of the ineffective assistance of counsel. As a general rule, post-conviction relief is not available for grounds not raised in the petition. See State v. Miller, 508 S.W.2d 804, 806 (Tenn. Crim. App. 1973); Long v. State, 510 S.W.2d 83, 85 (Tenn. Crim. App. 1974). Although we do not necessarily believe that a new ground for relief must be ignored on appeal when it has been fully litigated at the evidentiary hearing and treated by the parties and the trial court as an issue for determination, such is not the present case. Under the existing circumstances, we do not believe that the petitioner is entitled to assert this ground for relief as an appealable issue.

C. Relative to the claim that the petitioner's conviction and sentence must be set aside because the petitioner suffered torture and abuse inflicted by prison guards, we are unable to consider this ground on the record before us. The petitioner did not raise this claim until well after his petition was heard. Although he sought to reopen the proof, the trial court pretermitted the issue. Under these circumstances, we have nothing before us upon which we could base a decision on the merits. Although the trial court should have determined whether the petitioner's claim merited reopening the proof and, if so, then determined the merits of the issue, the present appeal presents nothing for our review.

D. Finally, as to the petitioner's contention that he is entitled to relief "on the basis of other claims, viewed separately and cumulatively" which he has asserted "at the different stages in this case," we conclude that no such ground of relief has actually been preserved for appellate review in this case. Petitioner presents no authority and makes no reference to the record, only referring the court to a list of seventy-four claims the petitioner presents in Appendix A to his brief. Failure to make appropriate references to the record in the argument portion of the brief and to cite relevant authority as required by Rule 27(g) and (h), T.R.A.P., will constitute waiver.

36

State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).  It is not our function to search the entire record for support, or lack thereof, for the petitioner's myriad bare claims.  Therefore, we conclude that none of the claims to which the petitioner refers are preserved for appellate review in this appeal.

In consideration of the foregoing and the record as a whole, we conclude that the evidence does not preponderate against the trial court's determinations.  Accordingly, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge
_____


CONCUR:


____(not participating)_____
Paul G. Summers, Judge


_____
Joe G. Riley, Judge