LUTHER SULLIVAN

*v.*

G. L. GREEN D/B/A BIG ROCK COAL COMPANY.

(*Nashville,* December Term, 1959.)

Opinion filed December 11, 1959.

Rehearing denied February 5, 1960.

44

T. A. Greer, Jr., Dunlap, for plaintiff-appellant.

A. A. Kelly, South Pittsburg, for defendant-appellee.

Mr. Chief Justice Neil delivered the opinion of the Court.

The plaintiff in error, who was the plaintiff in the trial court, was seriously and permanently injured while working as a regular employee of the defendant, Big Rock Coal Company. His injury resulted from pushing a loaded coal car in the defendant's mine. His disability flows from a hiatus hernia or rupture of the diaphragm.

The defendant employer paid the petitioner compensation under the Workmen's Compensation Statute at the rate of $30 a week for four consecutive weeks, or a total of $120, at which time it ceased payments on the ground that the disability complained of was temporary and that he could be cured by a surgical operation. It offered to pay all the costs incident to such an operation and moved the trial court to require him to submit to the

operation. The insistence was made that such an operation was not hazardous but was reasonably safe. The plaintiff refused on the ground that it was a serious operation and he regarded it as dangerous to his life. The trial judge sustained the above motion resulting in an appeal to this Court.

There are four assignments of error. But the determinative question may be resolved in the last two assignments, which are as follows:

"3. The Court erred in holding that a diaphragmatic hiatus hernia comes within the *purvue* and under the provisions of T.C.A. Section 50-1009."

"4. The Court erred in holding petitioner does not suffer from any chronic disease nor is otherwise in such physical condition that it is unsafe for him to undergo said operation, when the undisputed proof shows the petitioner is suffering from a congenital short esophagus and overweight."

The important findings of facts by the trial judge and his conclusion appear on pages 11 and 12 of the record, and are as follows:

"3. That this type of diaphragmatic hernia is a specific type of the general classification of abdominal hernias, and, therefore, falls within and is governed by the terms and provisions of TCA Section 50-1009 and *that petitioner is onerated with the duty of undergoing a radical surgical operation for the repair of said hernia unless excused there from for any causes provided in said Act.* (Italics ours.)

"4. *That petitioner does not suffer from any chronic disease nor is he otherwise in such physical condition*

*that it is unsafe for him to undergo said operation;* and there exists no reason or excuse upon the facts of this case or under law which relieves petitioner of the duty to submit to said operation. (Italics ours.)

＊　＊　＊　＊　＊　＊

"6. That by reason of said refusal to undergo said operation, the right to receive and collect compensation from the date of said injury and continuously thereafter during the time of such refusal is suspended in accordance with the provisions of the statute."

Section 50-1009, T.C.A., reads, as follows:

*"Hernia.*—In all claims for compensation for hernia or rupture, resulting from injury by accident arising out of and in the course of the employee's employment, it must be definitely proven to the satisfaction of the court:

"First. That there was an injury resulting in hernia or rupture.

"Second. That the hernia or rupture appeared suddenly.

"Third. That it was accompanied by pain.

"Fourth. That the hernia or rupture immediately followed the accident.

"Fifth. That the hernia or rupture did not exist prior to the accident for which compensation is claimed.

"All hernia or rupture, inguinal, femoral or otherwise, so proven to be the result of an injury by accident arising out of and in the course of the employment,

shall be treated in a surgical manner by a radical operation. If death results from such operation, the death shall be considered as the result of the injury, and compensation paid in accordance with the provisions of this law.

"In case the injured employee refuses to undergo the radical operation for the cure of said hernia or rupture, no compensation will be allowed during the time such refusal continues; if, however, it is shown that the employee has some chronic disease, or is otherwise in such physical condition that the court finds it unsafe for the employee to undergo said operation, the employee shall be paid compensation in accordance with the provisions of this law."

The evidence shows conclusively that Mr. Sullivan is totally and permanently disabled from engaging in any gainful occupation. He was fifty-two (52) years of age and had been a coal miner all his life. He describes his injuries as extremely painful in the region of the left breast when he lifts anything, and has considerable shortness of breath. This appeared immediately after the accident and continued up until the day of the trial in the Circuit Court. His condition was diagnosed as a rupture of the diaphragm or "diaphragmatic hernia". Regarding a correction of this condition he was told by doctors that it would require an opening of the chest and the removal of a section of a rib or ribs. He testified that during the examination at Erlanger Hospital, where he was taken for diagnosis, these doctors made an effort to pass a tube down through the esophagus "but they never did get the tube down in there * * * I don't know what was the reason they didn't * * * they was

going to do the operation the next morning." There were four doctors who were thus making the examination. According to his testimony one of the doctors (could not recall his name) said: "Well, it's going to be a bad operation * * * I am going to leave it up to you, you might make it and you might not." "I told Dr. Eyssen if it's going to take my chest out I am going home" and he replied: "I am not going to tell you to take the operation." He declined to take the operation.

Dr. D. C. Ludington, a witness for the plaintiff and an experienced surgeon, testified that *no capable surgeon would undertake an open chest operation by himself.*

"Q. Would you say that this type of operation that Mr. Sullivan would have to have, if this were attempted to be corrected, would it be a serious or very serious operation? A. Well, *it would be very serious.* (Italics ours.)

\* \* \* \* \* \*

"Q. Doctor, in the medical field do operations for this type of diaphragmatic hernia, are they attended with the same degree of success that an inguinal hernia operation is? A. Well, not the same degree but they are usually fairly successful *if it can be done. There are many of them that they don't even attempt to do.* (Italics ours.)

"Q. Doctor, under Mr. Sullivan's present condition is he, as he exists here today, in your opinion, and from your examination, taking into consideration his whole history and your examination of him and the fact that he is a coal miner and has been as such employed all of his adult life, in your opinion, what percentage of dis-

ability is he now laboring under his body as a whole?
A. Well, I think it is a hundred per cent.''

Dr. Tim J. Manson, a qualified surgeon, competent to testify as an expert regarding an operation for ''diaphragmatic hernia'', expressed the opinion that Mr. Sullivan could safely undergo the operation. He first testified that the diaphragmatic hernia ''is within the abdominal wall'' and the operation is not considered ''unusual''.

''Q. In your opinion, from your examination of Mr. Sullivan, does it appear that if he should condition himself by process of dieting under the direction of a physician and then undergo a surgical operation for the repair of this hernia, that in all probability the results would be attended with success? A. Yes, I think so.''

On cross-examination he said this type of operation, that is to correct it, ''would be bigger surgery than inguinal or femoral.'' He did not do surgery himself, but ''I know in general what would be done.''

''Q. Would you now say generally that an operation of this type would definitely be classified as major surgery? A. Yes.

''Q. Of course, with all the improvement there are dangers surrounding any major surgery, is there not, of life? A. Yes.

''Q. Of course, you nor any other doctor would give any particular assurance to a man of Mr. Sullivan's age and condition any assurance that he would definitely survive such an operation. A. No. The mortality rate, according to statistics is not prohibitively high

and I think the chances of success would lie in the range of 90 per cent of success.''

Dr. John Paul Carter, a competent surgeon, testified for the defendant and expressed the same expert opinion as did Dr. Manson. He saw Mr. Sullivan in consultation with Dr. Eyssen. The latter did not testify.

''Q. Dr. Carter, was Mr. Sullivan suffering from any chronic disease or any other physical condition or disability which would render it unsafe and hazardous for him to have to undergo or to undergo a surgical operation for the repair of this hernia? A. No, sir. At the time we saw him we did not find any other type of general disease that would contra-indicate operation at that time.

\* \* \* \* \* \*

''Q. Now, taking this man's condition as you found it at the time when you and Dr. Eyssen recommended an operation, what in your opinion, are the probabilities with reference to a successful result being obtained through this type of surgical operation? A. I would say 90 to 95 per cent success could certainly be expected.''

Dr. Carter further stated that an operation of this kind would require considerable opening up of the chest cavity.

It cannot be doubted but that this employee fears the result of an operation. One of the attending physicians, Dr. Eyssen said to him ''that he would not advise him to take it.'' Dr. Eyssen did not testify in the case. It is admitted that the surgery required involves a serious major operation.

Summarizing the expert medical testimony; Dr. Ludington testified that such an operation was a serious one; that it it attended with the same degree of success as an inguinal hernia *"if it can be done. There are many of them that they don't even attempt to do."* (Emphasis supplied.)

Dr. Manson in expressing his opinion that Mr. Sullivan could safely undergo the operation qualified it by saying *"if he should condition himself by process of dieting under the direction of a physician."* (Emphasis ours.) An operation of this kind would require considerable opening up of the chest cavity. Doctors Manson and Carter agreed substantially that 90 to 95 per cent success could be expected.

The foregoing testimony of the medical experts leaves no doubt in our minds as to the extent of the operation. While they do not describe it as dangerous yet they speak of it as being a very serious operation. The clear inference to be drawn from this undisputed evidence is that the risk attending it is sustantial and far greater than an operation for the correction of an inguinal or femoral hernia. The two medical experts for the defendant, Dr. Manson and Dr. Carter, do not contend that the operation can be successfully performed until after Mr. Sullivan has gone through a process of dieting under the direction of a physician in order to take off fifty (50) pounds of excess weight. During this dieting process Mr. Sullivan is denied any and all compensation. There is no evidence as to how long this will require, and there is no evidence as to what his physical condition will be after the reducing process.

■ The trial judge rested his decision upon T.C.A. 50-1009, supra, and his finding of fact upon the assumption that the medical testimony that Mr. Sullivan had no "chronic disease" *or other condition that would render it unsafe for him to undergo said operation.* He overlooked the admitted fact that at the time he was examined by these physicians he was in no condition to undergo the operation. He also overlooked this further undisputed fact, that his condition was such (due to overweight or some other cause) that these doctors could not insert a tube into and through the esophagus. This was thought to be an important exploratory examination to determine if it were safe to perform the operation which was scheduled for the following morning.

■ The next error complained of is that "The Court erred in holding that a diaphragmatic hiatus hernia comes within the purview and under the provisions of T.C.A. Section 50-1009." This statute was enacted for the express purpose of removing from the field of speculation the problem of whether or not a hernia was the result of an accidental injury, a trauma, or a congenital disease, arising out of and in the course of employment. *Matthews v. Hardaway Contracting Co.,* 179 Tenn. 98, 163 S.W.2d 59; *Stone & Webster Engineering Corp. v. Davis,* 191 Tenn. 42, 231 S.W.2d 376. The statute clearly contemplated injuries resulting from a rupture of the abdominal wall which appeared *immediately after an accident, and such as could be then seen by the injured employee. Stone & Webster Engineering Corp. v. Davis,* supra, and cases cited.

While 50-1009 T.C.A. on its face applies to "all hernia or rupture, inguinal, femoral or otherwise", there is this

qualification; "so proven to be the result of an injury", etc., that is "so proven" in strict compliance with the provisions of the statute itself, to wit, that the hernia or rupture appeared suddenly; that it was accompanied with pain; that the hernia or rupture immediately followed the accident; that the hernia or rupture did not exist prior to the accident for which compensation is claimed.

■ The accident which admittedly caused the diaphragmatic hernia in the case at bar could not possibly be "so proven", that is that it "appeared suddenly". True it is there was a sudden and continuing pain, but neither Mr. Sullivan nor any doctor knew that there had been a rupture of the diaphragm. Nor could Mr. Sullivan prove there had been no *prior existing hernia* as required by the statute. It certainly was not a hernia that could be seen by the employee, or any other person including his doctor, shortly after the accident. *Stone & Webster Engineering Corp. v. Davis,* supra.

It is extremely doubtful if a hernia, such as confronted the trial court and is now before us, was generally known among the laity when 50-1009, T.C.A., was enacted. For the reasons stated herein we are constrained to hold that it was not the legislative intent that a *diaphragmatic hernia* must be proven according to the terms of the statute and necessary to maintain an action under our Workmen's Compensation Act.

The sole question now before the Court is whether the trial judge erred in requiring Mr. Sullivan to undergo the "radical operation" as provided by the statute and in the suspension of compensation pending his refusal to undergo it.

█ We have heretofore discussed with some detail the medical testimony regarding the nature of the operation, and the probability of its being a success. Whether or not this injured employee must undergo what is admittedly a serious major operation or lose his right to compensation for total permanent disability is a delicate question for the Court to decide. "The question when compensation should be suspended because claimant refuses to submit to reasonable treatment or surgery is one of the most delicate medico-legal issues in the entire realm of workmen's compensation." Larson's Workmen's Compensation Law, Vol. 1, Section 13.22.

█ That the statute before us requires the claimant to undergo a surgical operation cannot be doubted. But in all such cases the claimant will not be penalized *if his refusal is reasonable.*

"* * * The difficulty arises when 'reasonableness' has to be defined. The judgment usually resolves itself into a weighing of the probability of the operation's successfully reducing the disability by a significant amount, against the risk of the operation to the claimant. If the risk is unsubstantial and probability of cure high, refusal will result in a termination of benefits. But if there is a real risk involved, and particularly if there is a real chance that the operation will result in no improvement or even perhaps in a worsening of the condition, the claimant cannot be forced to run the risk at peril of losing his statutory compensation rights." Larson's, Vol. 1, Section 13.22.

█ The foregoing fairly represents this Court's holding in our reported cases. Furthermore we feel that the Court should not undertake to solve the problem solely

on medical statistics and expert testimony, although in some cases it might become necessary to do so. All medical experts agree (as did the doctors in the case at bar) that there is a small percentage of fatality in all major operations, while in many others the risk is substantial.

■ We dealt with this question in *Edwards v. Travelers Ins. Co.,* 202 Tenn. 364, 304 S.W.2d 489, 491, where the statute provided for suspension of payments to an injured employee who refuses to comply with a reasonable request to accept medical services proffered by his employer. But the operation tendered was for a "laminectomy", which involved an operation on the spine. In construing the provisions of this statute, it was said:

> " 'We think a reasonable construction should be given to our statute. We do not think it should be required that the injured employee should submit to a serious operation involving an appreciable risk of life in order that the pecuniary obligation created by law in his favor against his employer may be minimized. This rule appears to be supported by the great weight of authority, and is reasonable and works no injustice on the employer. If, however, it were otherwise, serious consequences would befall the employee in many cases.' "

We feel that the opinion of the Court in the Edwards case, which is rested upon *Fred Cantrell Co. v. Goosie,* 148 Tenn. 282, 255 S.W. 360, controls our decision in the case at bar.

■ The counsel for defendant in error invokes the doctrine of "ejusdem generis" in considering the question of legislative intent. We respectfully decline to

apply it in workmen's compensation cases, for to do so would require us to ignore the settled rule that the statute must be liberally construed in favor of the injured employee.

The most serious question made by counsel for the defendant in error is that there is material evidence to sustain the trial judge and on appeal this Court will not disturb it; citing *Tallent v. M. C. Lyle & Son,* 187 Tenn. 482, 216 S.W.2d 7; *Stone & Webster Engineering Corp. v. Davis,* supra, and *Adams v. Patterson,* 199 Tenn. 603, 288 S.W.2d 453. We have heretofore consistently adhered to the foregoing rule, and we will not now depart from it. The same insistence was made in *Edwards v. Travelers Ins. Co.,* supra. But, as in the case at bar, where the trial judge has overlooked undisputed material evidence bearing upon the determinative issue, the finding of fact by the trial judge is inconclusive, and the same is true where the determinative, or material issue involves a mixed question of law and fact.

Adverting to the holding of the Court in the Edwards case, the same problem had previously arisen with regard to a hernia, and compensation suspended pending refusal to accept a proffered operation. *Sun Coal Co. v. Wilson,* 147 Tenn. 118, 245 S.W. 547. In this case the operation was not "attended with unusual danger or pain, and can be successfully performed under a local anaesthetic". In *Crane Enamelware Co. v. Dotson,* 152 Tenn. 401, 277 S.W. 902, 903, the Court held: "When the conditions are such as those appearing in *Sun Coal Co. v. Wilson,* 147 Tenn. 118, 245 S.W. 547, the employee would have to submit to an operation." In the foregoing cases there was no appreciable risk involved.

 In considering the question of the claimant's refusal to undergo a major operation of any kind where it is admitted to be a serious one, we think the viewpoint of the injured employee should be considered as well as attending surgeons. Of course, his fear of an operation is not controlling, but we must consider realistically if such fear is reasonably justified under all the facts.

In conclusion we feel that the risk of fatality is substantial, and the judgment of the trial court was erroneous. It results that the judgment is reversed and the case is remanded for entry and execution of a judgment in favor of the plaintiff in error as for total permanent disability. The defendant in error will pay the costs of this appeal.