IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 7, 2008 Session

## PDQ DISPOSAL, INC. v. METROPOLITAN GOVERNMENT OF NASHVILLE-DAVIDSON COUNTY

Appeal from the Chancery Court for Davidson County
No. 05-1429-II     Carol L. McCoy, Chancellor

No. M2007-01289-COA-R3-CV - Filed April 15, 2008

A corporation providing garbage collection services under a contract with Metropolitan Nashville brought suit seeking reimbursement for waste disposal fees allegedly due under the contract. After a trial, the chancellor found in favor of the disposal company and awarded it damages for breach of contract. Metro appeals the court's interpretation of the contract. We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and RICHARD H. DINKINS, J., joined.

Lora Barkenbus Fox, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville-Davidson County.

Gerald E. Martin, Nashville, Tennessee, for the appellee, PDQ Disposal, Inc.

**OPINION**

### I. FACTUAL BACKGROUND

In November 1998, the Metropolitan Government of Nashville and Davidson County ("Metro") issued a request for proposal ("RFP") for "Services of Collection of Residential Refuse in the Urban Services District Areas 5 and 7." During the bid process, Metro provided written answers to questions raised by prospective bidders; this document became Addendum No. 1 ("Addendum 1") to the contract at issue here. PDQ Disposal, Inc. ("PDQ") submitted a proposal and was the successful bidder to provide refuse collection services in Area 5. Metro and PDQ entered into a contract for the collection of residential refuse in Area 5 of the Urban Services District for the period from May 16, 1999 through March 31, 2004.

The contract between PDQ and Metro incorporates the RFP, the contractor's proposal, and Addendum 1. Pursuant to the express provisions of the contract, in the event of conflicting provisions, the order of priority is (1) any amendment or change order, (2) the contract, (3) the RFP, and (4) the contractor's proposal and Addendum 1.[1] Under the terms of the contract, Metro was to pay PDQ $4.84 per month per household in Area 5. This rate was subject to change after the first year based upon increases or decreases in the Consumer Price Index for transportation. The RFP contains a formula for the reimbursement of "disposal costs based on the number of households under contract." The disposal reimbursement provisions are at issue in this case.

The contract required PDQ to dispose of the refuse collected from Area 5 at a location of Metro's choosing. When the contract went into effect in March 1999, Metro directed PDQ to dispose of the Area 5 refuse at the Nashville Thermal Transfer Corporation ("the thermal plant"), a facility owned by Metro. The thermal plant tip fee was $30 per ton. Based upon this tip fee, the RFP provided for a "rebate amount" of $2.78 per home per month to be paid by Metro to PDQ as reimbursement for disposal costs.[2] The Metro reimbursement was credited to PDQ's account at the thermal plant.

For the first three years of the contract, the system worked well. PDQ trucks came to the thermal plant with loads containing both Metro residential garbage and non-Metro commercial garbage. There is a dispute between the parties as to whether this "commingling" of garbage was allowable under the contract. For billing purposes, the thermal plant would weigh each PDQ truck. Metro would then provide PDQ with an invoice showing the tonnage brought in by all of its trucks and giving PDQ a credit based upon the Area 5 residences being serviced. For example, in August 2001, PDQ was picking up garbage at 24,090 homes in Area 5; at $2.78 per house, this resulted in a credit of $66,970.20 on PDQ's balance at the thermal plant to reimburse PDQ for the disposal of refuse collected in Area 5.

Problems arose due to the occurrence of an unanticipated event: the thermal plant burned down on May 23, 2002. At that point, Metro directed PDQ to take the Area 5 refuse to the BFI Transfer Station ("BFI"). Metro did not own BFI and, therefore, did not control its billing system. Metro paid BFI for disposal of residential refuse collected by PDQ and its other contractors. Initially, all of the Metro contractors were on the same Metro account with BFI. Within a few months, BFI set up a separate Metro account for each Metro contractor; PDQ's account was designated "PDQ/Metro" on BFI invoices.[3] After reconciling the dump tickets--documents showing

---

[1] Since the contract lists the proposal and the addendum together, we will treat them as having equal priority in construing the contract.

[2] Addendum 1 states: "The rate for disposal cost is based on the average weight of the waste of each residence being about 43 pounds per week, or 185 pounds per month. At the current tip fee of $24 per ton and the Solid Waste fee at $6 per ton ($30 per ton total), the cost of disposal of this 185 pounds per month is $2.78."

[3] PDQ also had its own separate account with BFI to pay for disposal costs of non-Metro accounts.

the amount of waste tipped for a contractor--with BFI's bill, Metro would pay BFI for the PDQ/Metro bills.

The problems that arose relate to the amount Metro paid BFI for PDQ's Area 5 accounts. Instead of paying BFI according to the formula set out above at $2.78 per home, Metro paid BFI for the actual tipping fees for the garbage from Area 5.[4] In late 2002, Metro notified PDQ that BFI would no longer accept commingled loads. Under the new payment scheme, Metro required PDQ to segregate the Area 5 refuse from any other garbage PDQ collected. At BFI, the drivers would be asked to identify the source of the refuse in each load.

In June 2005, PDQ filed the present lawsuit alleging breach of contract, unjust enrichment/quantum meruit, conversion and resulting trust, and promissory estoppel. The complaint alleges that Metro breached its contract by refusing to honor the "dump credit"–a term used to describe the original reimbursement scheme under which PDQ received a monthly credit based upon the number of Area 5 households serviced at the rate of $2.78 per house. PDQ alleged that Metro owed PDQ "a total of $205,982.69, excluding interest, which PDQ has paid to dispose of refuse that should have been credited or paid for by Metro."[5] Metro had been paying BFI the tipping fees associated with the actual tonnage of Area 5 garbage brought in by PDQ, but had not paid the difference between the BFI tipping fee and the amount due under the per household formula.

The case was heard before the chancellor over a period of three days in November 2006 and one day in February 2007. We will describe here a general outline of the proof:

William Davis, Assistant Director of Finance and Administration for Metro Public Works. Mr. Davis described the billing process by which the contractors were reimbursed for disposal costs at $2.78 per household. He characterized the estimate of the amount of garbage generated by an average household upon which the $2.78 rate was based as being "pretty generous." This formula was designed to be "a fair way to assess the cost of disposal on [refuse collection] routes." Contractors were reimbursed according to the number of households for which they collected Metro refuse, regardless of the amount of garbage they delivered to the thermal plant. Mr. Davis also testified that Metro was "trying to make sure that Thermal had enough resources to heat the downtown Nashville and the Department of Public Works' role was to make sure that off its routes that it brought in all the trash it needed to operate that." Over Metro's objection, Mr. Davis was asked to read into the record his deposition testimony that Metro was aware that PDQ intended to commingle garbage–i.e., collect Area 5 refuse and other refuse in the same trucks–and that Metro did not care where the refuse was coming from because of the dump credit. Mr. Davis further testified at the hearing that, when PDQ was disposing of Area 5 refuse at the thermal plant, Metro

---

[4]BFI's per ton tip fee was $32.60.

[5]The complaint alleges that PDQ is entitled to reimbursement for its dump credits pursuant to the March 16, 1999 contract and under an emergency contract entered into between Metro and PDQ on March 26, 2004. It appears that PDQ has abandoned the theory regarding the March 26, 2004 contract on appeal. Therefore, we need not consider the latter contract further.

did not have the money to pay anyone to monitor the routes. He admitted that no one asked the contractors bringing refuse to the thermal plant to identify the source of the refuse.

Jason Reed, a PDQ driver from June 2000 through May 2002. Mr. Reed testified about the process of disposing of Area 5 refuse at the thermal plant and at BFI. He stated that, at the thermal plant, no one ever asked him where the garbage came from. At BFI, he was asked if the garbage was Metro or private.

Glenn Tubbs, PDQ president during the relevant time period. Mr. Tubbs was involved in the formation of the contract between Metro and PDQ. He stated that it was in PDQ's financial interest to commingle garbage since the contract did not allow any dump credits to carry over from month to month. Mr. Tubbs testified: "Had [Metro] only wanted Metro trash there would be no need to have a formula for so many pounds per home. You would just take it in there and say this is Metro trash and they would take it as such the way they do now." He also testified about a meeting held by Metro in early 2002 regarding the phasing out of the thermal plant. Mr. Tubbs testified that, after Chase Anderson took over as solid waste director, he told Mr. Tubbs that commingling was not allowed. Eventually, Metro started monitoring the collection routes and disallowing payment on any loads containing commingled garbage.

Jack Tucker, Superintendent of Operations of Waste Division of Metro Public Works. Mr. Tucker testified that, after the fire at the thermal plant, his department was able to get funding to hire someone to oversee the contracted refuse collection routes. He stated that there were policies that required the thermal plant to ask contractors where the refuse was coming from, and that he had observed this policy to be enforced when he was at the plant. Mr. Tucker estimated that, prior to the fire, he was at the thermal plant at least once a day. He further testified: "We had always suspected that there were, as we interpreted, violations of the contract happening, that there was commingling going on by all the contractors. And we never had the financial capacity to hire sufficient people to audit the contractors to determine whether or not that was factual." His understanding of the disposal credit formula was that "[t]here had to be some unit of safety for Metro protecting the taxpayers of Davidson County who were footing the bill for the contracts that would somehow audit the waste that was being collected under the contracts." After the thermal plant burned down, Mr. Tucker testified, "I'm sure anybody in finance was more receptive [to the need to hire someone to monitor the refuse collection contracts] as that Metro didn't control the disposal point or need the waste for energy anymore, there was a little easier sale that there was a need to audit the waste that was being brought in under the contracts." Before the thermal plant burned down, the additional waste did not have a significant financial impact; after the thermal plant burned down, there was a financial impact. Once the monitor detected that the contractors were commingling, Metro informed the contractors verbally and in writing that this practice had to stop and that Metro would not pay for commingled loads.

Brian Crick of Crick Disposal, Inc. ("Crick"), another company that contracted with Metro in response to the 1998 RFP for residential refuse collection. Crick did not collect refuse on non-Metro routes and often did not use all of its disposal credit for a month. At some point, Crick started

selling its extra disposal credit to another contractor in the refuse collection business. Brian Crick testified that Metro knew that Crick was selling its extra disposal credit.

Earl Crick, former owner of Crick. Earl Crick testified that he had asked Diane Wiles [Director of Solid Waste for Metro Public Works at that time] about Crick's extra disposal credit, and she told him that he could do whatever he wanted to with it. She approved his sale of dump credits. Sometime after the contractors were directed to dispose of Metro garbage at BFI, Metro told Mr. Crick that he could no longer sell his disposal credits.

Kay Davenport, current PDQ President, PDQ accountant during the relevant time period. Ms. Davenport gave detailed testimony concerning the invoices sent to PDQ from Metro regarding PDQ's account at the thermal plant and the computation of the monthly credit for area 5 disposal. She also testified about her understanding, based upon a meeting held by Public Works with the refuse contractors in early 2002, of the proposed billing system to be used once the thermal plant had been phased out. In August and September 2002, Metro gave PDQ its usual credit based upon the number of homes it was servicing. After that, BFI switched to the individualized billing system (PDQ/Metro) and Metro only paid for PDQ's actual Area 5 tonnage. Ms. Davenport also went through her method for calculating the amount of damages incurred by PDQ from not getting the disposal credit from June 2002 through March 2004.

Yvonne Foote, the accountant for Solid Waste at Public Works. Ms. Foote, who managed the billing for all of the contractors, testified that she had assumed that the trash for which Metro was billed was coming only from contracted routes. She acknowledged that the full disposal rebate amount was awarded to each contractor every month. Ms. Foote testified that Diane Wiles, the director of solid waste, had come up with the disposal credit formula. Chase Anderson became the solid waste director after her.

At the close of PDQ's evidence, Metro moved for involuntary dismissal under Tenn. R. Civ. P. 41.02; the trial court granted Metro's motion in part, dismissing all of PDQ's claims except for the breach of contract claim. At the end of the hearing, the court took the breach of contract claim under advisement. In a memorandum opinion entered on May 15, 2007, the court ruled that PDQ was entitled to damages in the amount of $277,312.31, including pre-judgment interest, against Metro for breach of contract. This appeal followed.

## II. STANDARD OF REVIEW

This case turns on the interpretation of the contract between PDQ and Metro. The interpretation of a contract is a question of law, and therefore our review is de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006).

A mixed question of law and fact arises where the construction of a written agreement depends on extrinsic facts as to which there is a dispute. *Hibernia Bank & Trust Co. v. Boyd,* 48

S.W.2d 1084, 1086-87 (Tenn. 1932). Although a presumption of correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination as to the legal effect of its factual findings, nor by its determination of a mixed question of law and fact. *Travelers Ins. Co. v. Evans*, 425 S.W.2d 611, 616 (Tenn. 1968); *Sullivan v. Green*, 331 S.W.2d 686, 692-93 (Tenn. 1959). Our standard of review of rulings on mixed questions of fact and law is de novo with a presumption of correctness extended only to the trial court's findings of fact. *Abdur'Rahman v. Bredesen,* 181 S.W.3d 292, 305 (Tenn. 2005).

## III. ANALYSIS

This appeal requires us to determine whether the trial court erred in finding that Metro's contract with PDQ required Metro to pay the disposal credit to PDQ, regardless of the fact that disposal was no longer at the thermal plant. We must, therefore, examine what the contract provisions indicate as to the intent of the parties with respect to reimbursement for disposal costs, whether the contract allowed PDQ to commingle refuse, and whether Metro had the ability under the contract to change its reimbursement method after it directed PDQ to take the Area 5 refuse to BFI.

In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). If the terms of a contract are unambiguous, a court must determine the intent of the parties as expressed in the four corners of the contract. *Rogers v. First Tennessee Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987). The parol evidence rule generally prohibits the use of extrinsic evidence to alter or contradict the plain meaning of an unambiguous written contract. *Stamp v. Honest Abe Log Homes, Inc.*, 804 S.W.2d 455, 457 (Tenn. Ct. App. 1990); *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991). To aid the court's discernment of the parties' intention, however, the parol evidence rule does not prohibit the court from considering the circumstances surrounding the formation of the contract, the business to which the contract relates, and the construction placed upon the contract by the parties in carrying it out. *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000); *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997)*; Richland Country Club*, 832 S.W.2d at 558; *Coble Systems, Inc. v. Gifford*, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981). Moreover, any "[a]mbiguous language in a contract is construed against the drafter." *Jackson v. Miller*, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989).

We will analyze the pertinent provisions of the contract between Metro and PDQ in the order of their priority pursuant to the contract terms: (1) the contract itself, (2) the RFP, and (3) PDQ's proposal and Addendum 1.[6]

---

[6]There are no relevant contract amendments or change orders.

(1) Contract dated March 16, 1999

The main contract itself provides little guidance as to the questions at issue here. While the contract sets out the method and rate of compensation to PDQ based upon the number of households in Area 5, it is silent as to method of disposal of the collected refuse.

Under section 1 of the contract, PDQ "agrees to provide and Metro agrees to purchase the following services: Services of Collection of Residential Refuse in the Urban Services District No. 5." Pointing to the statement that the contract is for services of residential refuse collection, Metro argues that this section expressly covers residential and not commercial refuse. There is no question that Metro was to pay PDQ only for collection and disposal of residential refuse. But, that fact does not answer the question of how Metro agreed to pay PDQ for disposal of Area 5 refuse. PDQ's position is that the formula set forth in the RFP provided for a credit based upon the number of households. Metro's position is that this formula only provided a cap on the amount to be paid.[7]

(2) Request for Proposal (RFP)

For purposes of this case, which involves only the reimbursement for disposal costs, the heart of the parties' contract is found in the RFP. The RFP includes more specific provisions that we must interpret.

Part 6.0 of the RFP on Metro's departmental responsibilities is the key provision pertinent to the dispute in this case:

> *Metro will reimburse the contractor for disposal costs based on the number of households under contract.* The fee will be adjusted proportionally to any changes in the tip fees during the contract period. Currently with a $24/ton tip fee and $6/ton solid waste fee, the rebate amount is $2.78/home/mo.

The first sentence of this paragraph is an unqualified statement concerning how Metro will reimburse PDQ. Its provisions are not limited to disposal at a particular site. Metro is to reimburse PDQ for disposal costs "based on the number of households under contract." The paragraph goes on to give a specific "rebate amount" of $2.78 per household per month. Based upon this paragraph alone, PDQ was entitled to a set monthly amount of reimbursement for the households it serviced for Metro. Metro's argument that this formula was intended as a cap on disposal costs is not supported by the plain language of the RFP.

---

[7]Section 16 of the contract states: "No waiver of any provision of this contract shall affect the right of any party thereafter to enforce such provision or to exercise any right or remedy available to it in the event of any other default." Metro argues that this waiver provision "expressly refutes Plaintiff's assertion that they are entitled to payment for disposal of commingled refuse because the Metropolitan Government did not enforce this provision while Plaintiff was disposing of refuse at Thermal." Because we have determined that, in light of the method of payment to PDQ for disposal of Area 5 refuse, commingling of refuse was not prohibited, the waiver argument is without merit.

Part 2.0 of the RFP sets out the services to be provided under the contract and states, in pertinent part:

> The minimum services shall consist of furnishing labor, equipment, materials and supplies for collection and transportation of residential refuse and/or recyclables from the Urban Services District *to sites as specified by Metro*, and supplying additional solid waste to the Nashville Thermal Transfer Corporation, NTTC as proposed by contractor.
>
> The contractor may, in addition to delivery of all residential refuse collected in areas 5 and 7 under the terms of this contract to sites as specified by Metro, propose to provide on request of Metro additional residential refuse and/or other solid waste suitable for disposal at the NTTC provided, however, that Contractor shall be given at least seven (7) days notice by Metro of any such request. The additional waste delivered shall be subject to the fees set by Metro Code of Law for tipping and solid waste fees. The residential rebate shall not apply to waste delivered pursuant to this section.

(Emphasis added). The italicized language in the first paragraph of Part 2.0 indicates that the contract is for the collection and transportation of residential refuse to any site specified by Metro, not just to the thermal plant. This suggests that the other provisions of the contract apply regardless of the site specified by Metro.

Metro cites the second paragraph of Part 2.0 in support of its argument that commingling was not allowed under the contract. In particular, Metro emphasizes the last two sentences of this paragraph indicating that tipping fees will apply and that the residential rebate will not apply. The problem with this argument is that, according to the uncontradicted testimony adduced at trial, Metro never requested additional waste. The limitations cited by Metro apply only to "waste delivered pursuant to this section," referring to requests for additional refuse made by Metro. This paragraph does not address the situation at issue in this case–the system for reimbursing PDQ for refuse collected in Area 5 under its contract with Metro. Furthermore, this paragraph does not address the commingling of Area 5 refuse with other refuse.

Metro also cites Part 11.11 of the RFP, one of the provisions concerning the proposal format, stating that the proposal was to "include the method of collecting and transporting any committed additional waste proposed to the NTTC." The proposal was also to indicate the source of the additional waste.[8] As with Part 2.0, these provisions address Metro's ability under the contract to request contractors to bring in additional waste, with seven days' notice. For the reasons stated in the preceding paragraph, these provisions have no bearing on the issue at hand.

---

[8] As requested in the RFP, PDQ addressed additional waste in its proposal. On a form entitled "Services of Collection of Residential Refuse in the Urban Services District Area 5," PDQ proposed to provide "on request of Metro" all the additional refuse or solid waste PDQ had to the thermal plant.

Part 5.2 of the RFP, one of the provisions concerning the responsibilities of the contractor, requires the contractor "to follow routes and schedules provided by the Department of Public Works personnel." Metro points to this provision as evidence of the contract's limitation to residential refuse in Area 5, to the exclusion of commercial refuse collected by PDQ along the way. There is no doubt that the contract between Metro and PDQ was for the collection and disposal of residential refuse in Area 5. The question, though, is how PDQ was to be reimbursed for the disposal costs of that refuse. Under PDQ's argument, the formula required a flat per household disposal credit. The result was that PDQ could use this credit to reduce its costs on other accounts.

We find that the plain language of section 6.0 of the RFP provides the applicable method of payment: "Metro will reimburse the contractor for disposal costs based on the number of households under contract."

### (3) PDQ's proposal and Addendum 1

PDQ's proposal and Addendum 1 support our conclusion concerning the contract's payment terms.

PDQ's proposal: In the executive summary of its proposal to Metro, PDQ stated: "Any commercial accounts that are in the area of PDQ's rear loaders are added to the routes so as to create additional revenue as well as to supply additional waste for the Nashville Thermal Plant." In its business plan, the section setting forth its proposed approach for performing the contract with Metro, PDQ stated that it would "run the proposed routes with a 25-yard rear loader for curbside collection." These statements in PDQ's proposal, which became part of the contract between PDQ and Metro, reflect its standard practice of collecting residential and commercial accounts together in areas serviced by rear loaders, the equipment PDQ proposed to use in Area 5. Metro had notice of PDQ's plan. By accepting PDQ's proposal, Metro agreed to that arrangement to the extent that it did not conflict with the contract or RFP.

We do not find the PDQ proposal to be inconsistent with the RFP. Section 6.0 of the RFP provides Metro's reimbursement formula for the Area 5 refuse collected by PDQ. This method of disposal reimbursement was consistent with PDQ's business plan. There is no prohibition against commingling garbage, and Metro's chosen method of reimbursement could logically result in situations in which PDQ would have credit that it could apply toward its other disposal accounts. As discussed above, the paragraph in section 2.0 of the RFP concerning additional waste never came into play.

Addendum 1: Addendum 1 contains questions and answers from a meeting held by Public Works with prospective bidders on December 8, 1998. The answer to question 12 (quoted in footnote 1) explains that the reimbursement formula set out in the RFP was based on an estimate of the amount of garbage generated by an average household.

A linchpin of Metro's position is question 18, which asks: "If Thermal is full, who pays tip fee?" Metro answered: "If Thermal is closed and approval for waste to be diverted to another location is given, Metro will pay the tip fee with submittal of suitable documentation." Metro asserts

this part of the addendum was triggered by the closing of the thermal plant and that Metro was allowed to require "suitable documentation" for reimbursement. According to Metro's interpretation, the term "suitable documentation" "clearly must include documentation to show that the refuse disposed of is from residences in USD No. 5."

The most persuasive support for Metro's position is the express language in the answer to question 18 that "Metro will pay the tip fee" if Metro directs that refuse be diverted to another location. We find several problems with Metro's argument. First, question 18 assumes that the thermal plant was "full." This exchange seems to address the situation where the thermal plant was temporarily unable to accept refuse, requiring Metro to divert its contractors to another site. That is not the situation at issue in this case. Second, there is no definition of "suitable documentation." That term could mean simply that PDQ had to document that it disposed of its Area 5 refuse at another site before Metro would reimburse it. Metro did not produce any evidence to clarify the meaning of the suitable documentation language. Metro's ability to require suitable documentation does not, by itself, imply that Metro could change the whole reimbursement scheme and essentially pay its contractors less for the same service. Third, the addendum is to receive the lowest priority or weight in the event of any conflict between the addendum and other parts of the contract. We find that the clear language of section 6.0 of the RFP, which does not differentiate between disposal locations, governs and specifies the required payment method.

In light of the foregoing analysis of the contract provisions, we conclude that the contract required Metro to reimburse PDQ based on the per household formula, regardless of the disposal site. Therefore, Metro breached its contract by changing its reimbursement scheme after the thermal plant burned. Courts will not relieve a party of its contractual obligations for the sole reason that those obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network*, Inc., 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

Our interpretation of the language of the contract is consistent with the evidence adduced at trial concerning the circumstances surrounding the formation of the contract and the parties' dealings under the contract. The parties operated for three years under the per household reimbursement system; even after the thermal plant closed, PDQ received its full rebate for two of the initial months at BFI. Moreover, consistent with the language of the PDQ proposal, the evidence strongly suggests that Metro understood that PDQ was commingling Area 5 refuse and other refuse from the beginning of the contract. The only testimony supporting Metro's argument that the disposal rebate was a cap rather than a set monthly credit was that of Yvonne Foote. The chancellor stated that, "[t]o the extent that Metro submits that Yvonne Foote was unaware of the commingling, the Court finds her testimony unconvincing." After analyzing Ms. Foote's testimony, the court found "that Metro did not question the manner in which PDQ collected trash on its route until Metro decided to abandon and ignore the estimated weight provision in the formula." We give the chancellor's assessment of the evidence great weight since the trial court is in the best position to evaluate the credibility of the witnesses. *Thompson v. Adcox*, 63 S.W.3d 783, 787 (Tenn. Ct. App. 2001).

Accordingly, we find that the trial court properly interpreted the contract to require Metro to pay PDQ according to the per household formula.

## IV. CONCLUSION

We, therefore, affirm the decision of the trial court. Costs of this appeal are assessed against the appellant, for which execution may issue if necessary.

_____
ANDY D. BENNETT